Booth, Judge,
delivered the opinion of the court:
The action in this case is the result of differences of opinion between the plaintiff and the Commissioner of Internal Revenue as to the sections of the internal-revenue laws of 1918 and 1919 under which the plaintiff’s income, war, and -excess-profits tax should be computed. No jurisdictional questions are involved, and the amount in dispute is $322,--079.16. The case is one of importance.
The revenue act of 1918, 40 Stat. 1059, provides in part as follows:
“ * * * The term ‘ personal-service corporation ’ means ..a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who .are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether ■invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor .any corporation 50 per centum or more of whose gross in•come consists either (1) of gains, profits, or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6,1917, and November 11, 1918, both dates inclusive.'”
*730 Section 303 of the same law (40 Stat. 1089) is as follows:
“ That if part of the net income of a corporation is derived (1) from a trade or business (or a branch of a trade or business) in which the employment of capital is necessary, and (2) a part (constituting not less than 30 per centum of its total net income) is derived from a separate trade or business (or a distinctly separate branch of the trade or business) which if constituting the sole trade or business would bring it within the class of ‘ personal-service corporations,’ then (under regulations prescribed by the commissioner, with the approval of the Secretary) the tax upon the first part of such net income shall be separately computed (allowing in such computation only the same proportionate part of the credits authorized in sections 311 and 312), and the tax upon the second part shall be the same percentage thereof as the tax so computed upon the first part is of such first part: Provided, That the tax upon such second part shall in no case be less than 20 per centum thereof, unless the tax upon the entire net income, if computed without benefit of this section, would constitute less than 20 per centum of such entire net income, in which event the tax shall be determined upon the entire net income, without reference to this section, as other taxes are determined under this title. The total tax computed under this section shall be subject to the limitations provided in section 302.”
The plaintiff is a New York corporation with a paid-up capital stock of $1,400,000, divided into 14,000 shares of the par value of $100 each. Its place of business is New York City. The business of the plaintiff from which it derives income is conducted in the following manner: With 23 cotton mills it has contracts to sell their output upon the basis of a commission of 4% of the purchase price. With a few of the mills the contracts are in writing; with the others it is not so; but the plaintiff concedes that for all the mills its obligations are identical, whether in writing or oral. At the beginning of a season when markets for the mills’ products are available the mills quote to the plaintiff their fixed prices. From these prices plaintiff may not deviate. The plaintiff, through its organization, finds the buyers, and from them obtains contracts to purchase. Contracts of purchase were made out in triplicate, one copy for the purchaser, one for the mills, and one for the plaintiff.
*731 The goods embraced within a contract of purchase were shipped directly from the mills to the purchaser, the plaintiff being advised of this fact. Payments for the merchandise so shipped were made to the plaintiff and by it remitted, less commission, to the mills, the plaintiff guaranteeing to the mills the payment in full of the purchase price. The terms of sale fixed by the mills were usually cash, with an allowed discount of 2 per cent if paid within 10 days from receipt of shipment. The plaintiff in the course of its dealings with purchasers quite frequently advanced to them a sufficient sum of money to pay their bills and either taking advantage of the 2% discount allowed or charging interest for the advancement. Sometimes it so happened that a purchaser of the product of the mills required merchandise of a character the mills could not supply. In order to meet this emergency, the plaintiff went into the open market, procured the desired merchandise, and itself sold it to the purchaser at a profit.
The mills on occasions needed financial assistance at the beginning of a season. When so in need the plaintiff loaned to them the sums sought and collected interest for the loan. The plaintiff also derived income from stock investments, Liberty loan bonds, and interest upon bank deposits.
. The plaintiff is a close corporation, its stockholders of a limited number, in virtue of an express agreement between them whereby an option to purchase is granted to the remaining members in the event of the death or voluntary retirement of an owner. Its stock is not listed on the stock exchange and not offered for public sale. Fourteen stockholders owned an aggregate of 70% of the capital stock, and it is conceded by the defendant that the owners of 66.2% of the stock in 1918 and 74.4% in 1919 were regularly engaged in the active conduct of its business.
Plaintiff seeks, for taxation purposes, classification under section 303 (supra) as a part personal-service corporation in which invested capital is not a material income-producing factor and a part capitalized corporation in which invested capital is not only employed but necessary. In order to *732 meet the requirements of the statute plaintiff contends that its business activities are capable of distinct separation into distinct branches of a trade or business, and proof is adduced to support an allegation that the corporation is divided into the following distinct and separate branches, viz:
“ 1. Personal-service branch, not requiring the use of capital, to wit: Selling as agent on a commission. 2. Buying and selling on its own account; i. e., trading. 3. Interest received upon advances to mills. 4. Unearned or forfeited discounts. 5. Interest on bank deposits. 6. Allocation of part income to guaranty feature of its contracts.”
It is to be observed that all of the alleged separate branches require the use of invested capital. As to the alleged personal-service branch the argument is that the small allocation of invested capital to this activity is not a material income-producing factor. Invested capital performs a necessary and indispensable part in producing income as to the remaining branches.
The plaintiff’s system of accounting, reflected in bookkeeping, disclosed the income received from its various sources but did not disclose an allocation of invested capital to any one or more of its alleged branches. Prior to making its claim for a refund of taxes claiming an assessment on the basis set out therein, an expert tax accountant was employed, and to him the plaintiff exhibited its correct accounts, showing gross income from each source, and from these figures the accountant allocated $1,089,913.30 for 1918 and $1,595,159.72 for 1919 of plaintiff’s net income to business in which invested capital was not a material income-producing factor, and $445,375.77 for 1918 and $433,309.11 for 1919 to business requiring the use of invested capital, allocating $100,000 of the plaintiff’s invested capital to its alleged personal-service branch and the entire balance to its alleged branches requiring capital.
Section 303 {supra) is not a tax-exempting statute. It ■is no more than a legislative recognition of the existence of corporations wherein personal service and invested capital do each produce income capable of segregation. Distinctly *733 personal-service corporations were entirely exempt from income taxation under section 200 {sufra), and Congress extended to corporations, wherein its personal-service branch was distinct and separate from a branch or branches of its trade employing invested capital, a substantial reduction in rate rather than total exemption from income taxation. The defendant first challenges the plaintiff’s contention with an assertion that it was not engaged in a trade or business having separate and distinct branches within the meaning of section 303 of the revenue act of 1918. The question is a vital one.
The record must furnish convincing proof that the alleged personal-service branch of the plaintiff’s business is capable of distinct separation from its other sources of income and meets exactly the requirements of section 200 {sufra) of the revenue law defining a personal-service corporation. The interposed defense may only be overcome by sufficient proof that the income allocated to the personal-service feature is due primarily to the activities of the principal owners or stockholders regularly engaged in the active conduct of the affairs of the corporation and not to invested capital to any material extent. That this is obvious and indispensable appears from the express provisions of section 303, wherein Congress in pointing out the degree of segregation necessary to establish a personal-service branch of a corporation uses this language: “A separate trade or business (or a distinctly separate branch of the trade or business) which if constituting the sole trade or business would bring it within the class of ‘ personal-service corporations.’ ”
The plaintiff’s organization and single business enterprise was to earn income through commissions on sales of merchandise — a commission house. When incorporated it capitalized for $1,400,000. In 1918 its conceded statutory invested capital was $2,623,271.37. In 1919 it had attained the amount of $3,019,192.04. Therefore it is indisputably evident from the plaintiff’s own record that the corporation, when incorporated, regarded capital as necessary to its business, and subsequent events have demonstrated the wisdom of its presence. Manifestly it was not the *734 intention of the corporation to depend upon the personal service of its stockholders exclusively for returns from its business as a whole. Having at all times available an abundance of capital, the plaintiff was able to adopt a business policy whereby as an intermediary between the mills, its chief source of income, and its customers, to whom it sold their products, it could with profit extend accommodations, sporadic and temporary favors, incidental to and directly connected with the main object of its incorporation, and thereby retain the trade of both angles of its business and supplement the same with additional customers.
The plaintiff did not hold itself out to the business world as a money lender nor as a merchandising corporation. It did not deal with the public generally in this respect. To its own customers, a limited class from whom it derived its substantial and yearly income by way of commissions, it extended these accommodations, and to no others. There is no evidence in the record that the plaintiff cultivated this alleged special trade nor maintained separate and distinct organizations to attend to it. True, as plaintiff’s commission business expanded, this source of income expanded along with it, an incidental development, one that follows naturally from the inseparable connection of the two. As one grew the other grew in proportion thereto. The plaintiff was and is essentially a commission house, not dependent upon the personal service of its stockholders exclusively for income, but combining therewith invested capital of sufficient proportions to single it out from a distinct and purely personal-service corporation and attract to it business a corporation not so situated might be unable to obtain.
The so-called branches of its business, so sedulously insisted upon, were not, within the contemplation of the revenue law, separate and distinct enterprises; they were, as the defendant observes, “sources of income,” incidental activities, suggested by and inseparably a part of a commission business, the identical activities which in the very nature of the enterprise in hand would suggest themselves to a sagacious manager of a commission house. In keeping its books it never occurred to the plaintiff that its business *735 embraced five distinct and separate branches, for its accounts were not so kept, and it required the services of an expert to make an allocation of income thereto. The plaintiff treated the various features of its business policy as merely supplemental and subsidiary to its unified business purpose.
The plaintiff’s contention is vulnerable in this respect from other points of view. It is admitted that the guaranty given by the plaintiff to the mills, whereby payment for purchases made are secured, involves the employment of capital. As a matter of fact, the plaintiff’s expert ascribes $266,512.00 in 1918 and $266,929.88 as commission income derived from this source. The basis for this conclusion is one-half of one per centum of plaintiff’s total sales made for the mills less the total of its merchandise sales and a special commission included therein. Possibly this computation is the best obtainable under the circumstances, but clearly it is hypothetical, and along with the allocation of $100,000 of the company’s invested capital to the commission business more or less arbitrary. A sound financial commission house obligates itself to guarantee some of its customers against loss. The customers thus guaranteed patronize the concern to the extent of very large sums from which the corporation realizes most substantial profits in commissions.
Is it within the range of exact computation or even measurably accurate estimates to proportion in dollars and cents the amount of income chargeable alone to this business policy? We think not. Is it logical to conclude that an obligation thus assumed in some instances in the written contracts, which in terms fixes the commissions to be paid for the service to be rendered, and the corresponding obligations of the broker, that the plaintiff was segregating its commission business into branches, one of which was this guaranty? The mills turned over their products to the plaintiff to sell for them, induced in part so to do because they could rest secure in the knowledge that the purchase price would be paid to them, if not by the purchaser then by the plaintiff. The plaintiff did not have written contracts; with many of the mills, and much is made of this fact; but. irrespective of this, the plaintiff dealt with all of its customers on the same basis and observed this obligation, *736 whether in writing or otherwise. Of exactly the same nature and consequence was the plaintiff’s policy of loaning money to its customers to whom it sold the products of the mills. To retain both the mills and the purchasers was essential to its enterprise.
The plaintiff purchased cotton goods in the open market and held them for sale to such of its customers as could not fully supply their needs from the mills. In this respect the plaintiff acted upon its own account, and doubtless instituted the policy to maintain a relationship with the purchasers whereby they could be assured that all their business needs could be supplied by the plaintiff and thus forestall the necessity of patronizing other commission houses. Assuredly the income realized from this source designates it as a mere adjunct to the plaintiff’s main efforts. The plaintiff under no possible circumstances depended upon this source of income for profits. It was not setting itself up as a merchandising corporation or a part merchandising and part personal-service. The intended purpose was to retain patronage to the end of realizing profits from personal service, the adoption of business policies sufficiently attractive to bring to the company its large and growing commission business.
It is hardly necessary to indulge comment upon the remaining alleged branches of the plaintiff’s business. Interest on Government bonds and on bank deposits classify themselves. The language of the statute, evidenced by the precision with which it speaks, seems to clearly exclude from its terms a corporation whose business may not be segregated into the distinctly separate units, one a personal-service unit under section 200, and the others employing capital.
It is scarcely probable that Congress was intending to reach a corporation so organized that the division and allocation of its income to its various activities depends upon arbitrary, obscure, and hypothetical computations. To a situation wherein the plaintiff concedes that the allocations made are more favorable to the Government than to the plaintiff, a concession which admits inaccuracy, certainly the Government has no lawful right to exact more than is lawfully due. The revenue law requires a degree of certainty, *737 to say the least. Surely Congress was not providing for doubtful situations and extremely technical cases. A separate trade or business or a distinctly separate branch of the trade or business ought not, under ordinary circumstances, be difficult to identify. In the first enumeration the way is clear. In the second the word “ distinctly ” imports a trade or business disconnected with any other distinct trade or business making up the enterprise. It does not include the adoption of a concerted business policy of a corporation, employing various activities incidental to and inseparably intertwined with its main business, the purpose of which is to attain the success of the principal and unified business of the corporation.
The mere fact that income accrues from the activities so mentioned is not of itself sufficient to sustain a separate and distinct branch of the business. The income, like the activity, is incidental. It is not the source from which the corporation contemplates its real profits from which to pay dividends and accumulate a surplus. On the contrary, it is but a contributing factor toward the maintenance and support of the business the corporation was orginally organized to conduct. In other words, within the plaintiff’s own prescribed circle all the resources at its command were utilized to and did develop a most successful brokerage business, the identical and single object of its incorporation. As was said by the court in Matteson Company v. Willcuts, 12 Fed. (2d) 447:
“ Every corporation has full control of its own activities. It knows what the requirements of a personal-service corporation are. It may comply therewith and easily keep within the limits thereof, if it so choose, or it may not if it otherwise prefers. If it does not fairly observe and keep within the requirements of the law, it should not claim the benefits which the law confers. To nearly comply with the law, or to come within hailing distance thereof, is not. enough.”
A pointed illustration of a corporation engaged in distinct and separate branches of a trade or business is found in the following cases: Fidelity Deposit Company of Maryland v. United States, 259 U. S. 296; Malley v. Old Colony Trust *738 Co., 299 Fed. 523, 527. Article 1525, Regulations of the Commissioner, reads as follows:
“ In order that a corporation may be deemed to be a personal-service corporation its earnings must be derived principally from compensation for personal services rendered by the corporation to the persons with whom it does business. Merchandising or trading either directly or indirectly in commodities or the services of others is not rendering personal service. Conducting an auction, agency, brokerage, or commission business strictly on the basis of a fee or commission is rendering personal service. If, however, the corporation assumes any such risks as those of market fluctuations, bad debts, failure to accept shipments, etc., or if it guarantees the accounts of the purchaser or is in any way responsible to the seller for the payment of the purchase price, the transaction is one of merchandising or trading, and this is true even though the goods are shipped •directly from the producer to the consumer and are never .actually in the possession of the corporation. The fact that •earnings of the corporation are termed commissions or fees is not controlling. The fact that a commission or fee is based on a difference in the prices at which the seller sells •and the buyer buys raises a presumption that the transaction is one of merchandising or trading, and it will be so considered in the absence of satisfactory evidence to the contrary.”
The remaining obstacle to plaintiff’s right of recovery, as disclosed by the record, is found in the fact that it is not entitled in any event to classification as a personal-service corporation within the terms of section 200 of the revenue law — i. e., the plaintiff’s alleged commission branch, even if it constituted its sole business does not meet the reqirements of the law. Section 200 (supra) of the revenue law prescribes three positive essentials before a corporation may be classified as one depending upon personal service for its income: (1) The principal owners or stockholders must be regularly engaged in the active conduct of the affairs of the corporation, (2) the corporation’s income must be ascribed primarily to the activities of such principal owners or stockholders, and (3) capital must not be a material income-producing factor.
The defendant concedes, as shown in Finding XV, that the principal owners of 66.2% in 1918 and 74.4% in 1919 of the *739 plaintiff’s capital stock were conduct of the affairs of the corporation. Article 1529 of the Commissioner of Internal Revenue Regulations provides:
“ No definite percentage of stock or interest in the corporation which must be held by those engaged in the active conduct of its affairs in order that they may be deemed to be the principal owners or stockholders can be prescribed as a conclusive test, as other facts may affect any presumption so established. No corporation or its owners or stockholders shall, however, make a return in the first instance on the basis of its being a personal-service corporation unless at least 80 per cent of its stock is held by those regularly engaged in the active conduct of its affairs.”
It declines the receipt of a corporation’s return, in the first instance, on the basis of personal-service classification unless at least 80% of its stock is held by those regularly engaged in the active conduct of its affairs. The plaintiff vigorously assails the validity of the foregoing regulations, asserts it to be unwarranted and arbitrary, contrary to the statute, and an apparent attempt to engraft terms into the law omitted by Congress. With this contention we are disinclined to agree. The inherent structure of a personal-service corporation, one within the terms of the statute, compels an active and regular service from its principal owners or stockholders. The statute itself fixes limitations; “ principal -owners or stockholders ” certainly contemplates that a personal-service corporation must depend upon income from service from this source.
Stockholders may not profit from its return without distinct contribution in active service to their production. How this shall be ascertained is not definitely set forth in section 200 (supra), but in section 303 (supra), the act under which plaintiff claims, it is expressly provided that the tax imposed shall be computed “ under regulations prescribed by the commissioner with the approval of the Secretary,” The Supreme Court said, in United States v. Grimaud, 220 U. S. 506, 520:
“The legislature can not delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this *740 be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which can not be known to the lawmaking power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.”
In addition the regulation challenged does not irrevocably fix as a determinative factor a specific percentage of stock ownership. The bureau recognizes that the statute does not definitely refer to any fixed figures as a conclusive test in this respect, and all that reg'ulation itself does is to provide for “ first instance ” return, leaving open the question of final determination and an avenue for other contentions and claims.
The plaintiff’s income is not to be ascribed primarily to the activities of its principal stockholders. On the contrary, as heretofore discussed, invested and borrowed capital played an exceedingly important part in producing returns. It would be more than difficult to hold, in view of the findings, that without the large sums of invested capital constantly available the personal service of the stockholders would have resulted in the income realized. That the invested capital of the plaintiff’s company was a material income-producing factor is not alone disclosed in the preceding discussion, but clearly appears from the income realized from this source.
The purpose of exempting a strictly personal-service corporation from income taxes was to place them in a similar status with partnerships so engaged. Congress, by section 303, in extending a limited exemption to a part personal-service and a part capitalized corporation, carefully circumscribed the privilege by entailing upon the corporation claiming it the positive necessity of a distinct separation of its personal-service branch from its other branches in such a way as to meet the statutory requirements of section 200. However difficult it may be to segregate a going business concern into the parts required it must be done if the right is to prevail. There are no border-line cases. They must be within or without the law. Industrial corporations employ capital; and if they combine as separate and distinct a personal-service business along with the other business *741 operations, the scope of activities m'ust be capable of being broken up into units and not overlap, so that the Commissioner of Internal Revenue may not have nonsolvable difficulties in untangling one from the other.
The principal owners or stockholders, it seems to us, are required to give substantially all their time to the personal-service branch. Capital is to be an unimportant factor employed in a merely incidental way toward the payment of overhead expenses and not yielding appreciable income. Why, in this very case, if we are to accept the computations offered by the plaintiff, $100,000 of a statutory invested capital of $3,019,192.04 is allocated to the commission business yielding an annual profit in excess of $1,600,000 yearly, averaging at least 72% of the plaintiff’s total net income, and the remaining $2,919,192.04 of invested capital allocated to branches producing not to exceed 28% of its total net income! The growth of the plaintiff’s commission business, the company’s good will and financial status in the business world is, it seems to us, a complete refutation that it was aught else than a commission house, employing its substantial capital in its commission business.
It follows that the petition should be dismissed. And it is so ordered.
Moss, Judge; Gkai-iam, Judge; Hat, Judge; and Campbell, Chief Justice, concur.