COMMISSIONER OF INTERNAL REVENUE
v. ISAAC WINKLER & BRO. CO.
No. 5746.

Circuit Court of Appeals, Sixth Circuit.
Nov. 3, 1931.

DENISON, Circuit Judge, dissenting in part.

J. G. Remey, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch, C. M. Charest, and J. K. Polk, all of Washington, D. C., on the brief), for petitioner.

Virgil Y. Moore, of Washington, D. C. (Andrew T. Smith, of Washington, D. C., and Edgar M. Johnson, of Cincinnati, Ohio, on the brief), for respondent.

Before DENISON and HICKENLOOPER, Circuit Judges, and SIMONS, District Judge.

DENISON, Circuit Judge.

The Board of Tax Appeals held that, as to certain income received in 1918, the taxpayer corporation was a "personal service corporation," within the meaning of section 200 of the Revenue Act of 1918 (40 Stat. 1058), and hence was entitled to have its tax computed under the provisions of section 303 (40 Stat. 1089). In order to justify this conclusion, it was necessary to find three things (now disputed): First, that the income in question was derived from a distinctly separate branch of the trade or business; second, that the income of this separate branch was

to be ascribed primarily to the activities of the principal owners or stockholders; and, third, that in this branch of the business capital was not a material income-producing factor.

■■ Upon the first issue—that there was a "distinctly separate branch"—the Board made a finding. This finding is largely, if not wholly, one of fact, and is supported by some substantial evidence. We are urged to approve this finding for this reason alone. In so far as the finding is one of fact, we should accept it, under the opinion of this court in Tracy v. Commissioner, 53 F.(2d) 575, opinion this day filed (but see discussion in separate opinion, infra); and, in so far as the question is one of law, on the undisputed facts, we think it clear that the income was derived from a distinctly separate branch of the taxpayer's business. Its general business consisted in buying and selling a variety of chemical products. In addition, it sold on commission caustic soda and soda ash, made by the Columbia Chemical Company—indeed, the volume of its commission sales was much larger than of its trading sales. There was no conflict between the two lines of business. The commission sales were handled exclusively by Eli Winkler. The testimony that the two branches were independent and distinct, and that either could have been carried on without any confusion if the other had been discontinued, is undisputed. The gross income from each was determinable from the books at any moment, as well as any disbursements properly chargeable separately to either. The common expenses are merely to be allocated under the Treasury regulations. If there were confusion as to income allocation, as in Lane v. United States, 62 Ct. Cl. 721, the question would be very different.

■■ It is not doubted that the income of this branch was to be ascribed primarily to the activities of Eli Winkler; and we are satisfied that he was the "principal stockholder" within the meaning of section 200. Eli Winkler and his father had been practically the sole owners of the business in its former partnership form. The father died, leaving certain interests to the widow for life and the remainder to six children, of whom Eli was one. To meet the situation, there was a reorganization of the business into corporate form, having 5,000 shares of preferred and 5,000 shares of common stock. Of the preferred, Eli owned 1,200 shares, the widow had the beneficial use of 3,200 shares, but the legal title was in her and Eli as cotrustees. The other 600 were held by members of the

family. Of the common, Eli owned 4,995 out of the 5,000. The preferred stock, under the Ohio laws, has so far the color of an indebtedness rather than an ordinary stockholding [see Commissioner v. Shillito Realty Co. (C. C. A. 6) 39 F.(2d) 830, 69 A. L. R. 1266] that we doubt whether it should be taken into account in ascertaining who was the "principal stockholder" within the purpose and meaning of section 200; but, even if the entire stock were to be regarded as the basis of inquiry, it would appear that Eli owned 62 per cent. of the legal title absolutely, and another 32 per cent. jointly with another, holding also in his own behalf a part of the ultimate beneficial remainder in this trusteed stock; he was a stockholder to the extent of 94 per cent. Upon considering the purpose of the statutory indulgence to the personal service element in such a corporation, and examining as well the language used, we find no reason for adopting any such strictness of definition as would exclude Eli Winkler. The cases cited on behalf of the Commissioner on this point do not seem to us pertinent to such facts as we have here.

The question whether capital was a material income-producing factor admits of more doubt; but we are fairly satisfied that the Board was right in this respect also. There had originally been a contract between the taxpayer and the Columbia Company, by which the former was made the latter's exclusive selling agent for a fixed period, and, in consideration of a fixed commission, the taxpayer undertook the sale of the entire product and guaranteed the payment of the accounts. The period of this contract expired, and it was never renewed; but the exclusive selling arrangements had been continued by mutual consent up until and through 1918. After the first period, the taxpayer did, not guarantee the accounts. The practice was that Winkler obtained the orders and sent them in. It may be inferred, although it is not expressly stated, that the Columbia Company shipped the goods to the taxpayer's customers, but it billed them directly to the taxpayer, less commission and cash discount for payment within ten days. The taxpayer immediately billed the same items to its customers at full price. Usually the customers paid within five days, and the taxpayer was therefore able to make payment and save the discount within ten days. It occasionally happened that, at the end of ten days, some customer had not paid—in which case the taxpayer advanced the money to the Columbia Company and later collected from the customer. The evidence is undisputed—though general in terms—that this occurrence was exceptional, and so unusual and in such small amounts as to be relatively negligible. In the face of such evidence, we think the burden was on the Commissioner to go forward and show—as could have been done from the taxpayer's books if it were true—that this item was large enough and frequent enough to constitute the capital so used a "material factor" in producing income. The total gross income from this source (Columbia sales) was during the year nearly $5,-000,000; the net commission retained was nearly $120,000; and it is evident that there might have been a considerable number of such advances which would not, in their aggregate, have had any relatively substantial part in producing this large sum. The income currently received from this commission business was ample to meet the advances; there was no occasion to resort to the trading capital, nor any evidence that this was done. We ought not to assume that the Board made an error on this subject.

Since the taxpayer was also engaged in general trading business, it had considerable capital constantly employed and maintained a substantial bank balance; but we do not see that this, is material. Further, the statutory criterion relates to the "production" of the income, not to its impairment or expenses. Without doubt, this whole gross income was produced directly by the activities of Eli. He took the orders. The otherwise net commission was reduced somewhat by the office expenses.

The business arrangement with the Columbia Company cannot, in itself, be called capital in the sense used in the statute. It could be terminated at any time by either party; and, though doubtless the taxpayer expected it to be continued and regarded it as a valuable asset, this did not make it capital. The Commissioner suggested that it was carried on the balance sheet as a capital asset at $250,000. This is not supported by the proofs. At the beginning of the year 1918, among the assets there were listed "brand, investments, contracts and patents." There is nothing to indicate that this had any reference to or included the Columbia arrangement,—which was not a contract; and the whole item was cut out by the Commissioner in computing invested capital.

The order of the Board of Tax Appeals is affirmed.

DENISON, Circuit Judge, continues.

The foregoing is the opinion of the court. Not being able to concur with my associates who in the Tracy Case have discussed the rule for this court as to the binding effect of fact findings by the Board, it seems appropriate to state my views, for such effect as they may have upon the later consideration of this question by other courts. We are told that the rule of binding effect has been adopted by every other circuit. As a matter of words, expressly stated or implied, that is true; though we notice that in two circuits it is being rather frankly disregarded, and that in some others it seems to be occasionally ineffective. In this circuit we have carefully, until now, refrained from committing ourselves. Collin v. Commissioner, 32 F.(2d) 753; Routzahn v. Tyroler, 36 F.(2d) 208, 209; Guarantee Bond & Mortgage Co. v. Commissioner, 44 F.(2d) 297, 299. In no case has it seemed to us that the Board's fact conclusion was clearly wrong, and so the question presented has continued to be academic.

The statute (Revenue Act 1926, § 1003 [26 USCA § 1226]) says only that the conclusion of the Board should be reversed or modified, if it is "not in accordance with law." In the first reported case [Avery v. Commissioner (C. C. A. 5) 22 F.(2d) 6, 55 A. L. R. 1277], the matter was decided as one of first impression, and without particular discussion. It was assumed that the rule would be the same as upon appeal from a judgment in a law case tried before a judge without a jury. This opinion has been followed in the other circuits, and, as far as we find, without any considerable consideration or discussion of the rightfulness of the conclusion. Before the creation of the Board with its present jurisdiction, and before the Circuit Courts of Appeals had this power of review, the aggrieved taxpayer had the right to have every question of fact and law determined before a court and jury, and with appropriate rights of appeal. Upon the substitution of the present scheme it was realized—or at least believed—that a review by a constitutional court of the administrative or quasi judicial proceedings by the Board must be permitted. There was no, to me, obvious reason why the full review permitted through the agency of the District Court should be denied in the substituted review given to the Circuit Courts of Appeals.

It was doubtless familiar to Congress that the Circuit Courts of Appeals were commonly reviewing cases where the fact finding of the trial judge was conclusive, if supported by any substantial evidence, and also cases where such fact finding was treated with deference and assumed to be right, but unhesitatingly reversed if it was plainly wrong. The peculiarly inviolable character of findings of the first class grew out of the constitutional right to a trial by jury, the long-standing statutory rule that the appellate court should not re-examine any fact finding by a jury, and the continuation of the same character attributed to the findings when there was a stipulation waiving the jury and substituting the judge. Congress had the alternative (passing for the moment any constitutional question) of giving to the Board's findings either character when subjecting them to review by the Circuit Court of Appeals. It was not without precedents. In giving to these same courts power to review the Federal Trade Commission—a body essentially similar to the Board of Tax Appeals—Congress had expressly provided that the findings of fact, if supported by evidence, should be conclusive. In giving to a special court, made up in part or wholly of judges of the Circuit Court of Appeals, reviewing jurisdiction over the Interstate Commerce Commission, Congress had made the same express provision. When it came to the present tribunal, Congress did not adopt this familiar formula, but fixed, as the sole criterion, "in accordance with law." The natural presumption would be that, when Congress substituted for the plain words a new phrase, it did not intend the familiar result which it well knew how to accomplish. I see no reason why the new should be thought synonymous with the old. If we reverse a chancellor's finding of fact, because upon the whole record it is plainly wrong, even though supported by some substantial evidence, we reverse because this finding was not "in accordance with law." A conclusion is not according to law when it does not preserve to the parties the rights which the law requires—no matter what the reasons are or what the artificial distinctions between law and fact may be. If, for example, the law puts upon the Commissioner the burden of establishing a fact by a clear preponderance of the evidence, and although he produces some substantial evidence, the overwhelming weight is the other way, how can the findings of the Board against this preponderance be said to be "in accordance with law?" In the converse case, where the burden is on the taxpayer and the evidence is so compelling that any fair-minded trier of fact would establish the taxpayer's contention, but there is substantial

evidence the other way, can a finding against the taxpayer be "in accordance with law" within the meaning of a statute intended to secure the taxpayer's right to a judicial review? To hold that this counter evidence is not "substantial," even if it clearly would make an issue for the jury in a jury trial, is an expedient which I fear has been sometimes adopted, but it is not a satisfactory way of bringing about substantial justice.

There is another consideration, drawn from observing the statutes. The Board was created by the Revenue Act of 1924. This expressly provided, section 900 (g), 26 USCA § 1218 note, that, in later court proceedings, the findings of the Board should be prima facie evidence of the facts found. By the Revenue Act of 1926, which reorganized the Board and gave to this court the right to review, section 906 (f), as added by Revenue Act 1926, § 1000 (26 USCA § 1218) provided. that findings made under the former law should continue to be prima facie evidence; and I see no reason for finding congressional intent that findings made before 1926 should be only prima facie evidence, and that those of a later date should be conclusive; nor does it seem to me that the latter inference should be drawn because Congress said nothing on the subject. The prima facie policy was established; its abolition should not be lightly inferred.

There is still another consideration. The opinion of the court in the Tracy Case is based, and perhaps necessarily so, upon the theory that the Board is an administrative tribunal. In these cases there is originally a controversy between the government and the taxpayer as to the amount of the tax. The Commissioner represents the government. They are therefore adverse parties before the Board; and, when the decision is against the taxpayer and he seeks review, the controversy between him and the government persists, and there is a "case or controversy" of which a constitutional court may receive jurisdiction. Old Colony Co. v. Commissioner, 279 U. S. 716, 49 S. Ct. 499, 73 L. Ed. 918. As supporting this result, it makes no difference whether the Board is an administrative or a judicial body; but, if it is the former, and decides the controversy in favor of the taxpayer, then the government, speaking by this highest administrative body, and the taxpayer are in accord, and no controversy remains. If so, then this court cannot entertain a petition by the Commissioner to review the action of the Board. The present case does not directly involve this result, but

the decision in the Tracy Case makes it inevitable that we shall meet this question.

I do not regard the decision in the Phillips Case, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289, as decisive here. The court there assumed that the Circuit Courts of Appeals had an established rule of decision affirming the binding effect of these findings of fact (not observing that this court was not committed at all and some other courts somewhat vaguely, to such rule). The point decided was that, assuming the existence of this rule, it did not deprive the transferee party of his constitutional right to due process. Even then, there was careful reservation of the possible case (similarly reserved in our opinion in Routzahn v. Tyroler, supra), where absolute constitutional rights might be involved. The question now is as to the meaning of the statutory phrase "in accordance with law." The rule as to the effect of the Board's findings should be the same in all cases, whatever rights are involved.

So far as I observe, the cases cited in the Tracy Case and in the Phillips Case, when they do not depend upon the express language of the Interstate Commerce Act (49 USCA § 1 et seq.) or the Federal Trade Commission Act (15 USCA §§ 41–51), refer to judicial impeachment of administrative decisions in a collateral way—that is, even if the form of attack be direct, the question is whether the order attacked was void. None of these cases had to do with the construction of a reviewing power expressly given; and they do not seem to me to be pertinent.

It may well be, as our experience has indicated, that the extent of our reviewing power in this particular will not often be a practical question. The initial presumption against error, the deference due to the valuation of the assessing officers or other conclusion of experts (and members of the Board are experts in these matters), and analogy to the custom in reviewing fact findings of masters and chancellors, will commonly bring approval, as they would in the present case, and, I should think, in the Tracy Case; but we may have presented to us some case where the precise limit of our power to review a fact finding may be controlling, or even where the right of a party to have some particular question decided, both as to fact and law, by a court with complete judicial powers, may be involved. I think we should not now declare any abdication of that power. Doubtless the easiest way is to refuse to go behind the findings of fact; we may not travel that road merely because it is the shortest.