Downey, Judge,
delivered the opinion of the court:
The plaintiff, from June 16, 1917, to September 28, 1917, both inclusive, delivered to the U. S. Navy at Hampton Hoads 75,084.40 gross tons of Pocahontas coal, for which it has been paid at the rate of $2.24 per gross ton as the value thereof at the mines, a total sum of $168,188.20, in addition to which it has also been paid the freight paid by it for the transportation of said coal from the mines to the place of delivery, amounting to $111,631.60. Asserting that said coal was requisitioned by the Secretary of the Navy, acting for the President, recovery is sought of an additional sum as just compensation, measured by the prices it is alleged it could have sold said coal for in the market, and interest thereon as a part of just compensation. The acts of March 4, 1917 (39 Stat. 1193), and June 15, 1917 (40 Stat. 183), are pleaded.
The defendant denies that there was a requisitioning of the coal and asserts that it was delivered under an order placed by the Secretary of the Navy of date June 14, 1917, which defined the basis of compensation, and that upon that basis the plaintiff has been fully paid.
The order of June 14,1917, is pleaded as “ Exhibit A” and is made a part of the findings. It requested the plain- *241 tiíf to be prepared to furnish, its proportion, estimated at 61,000 tons, of the coal required by the Navy for the period ending September 30, 1917, fixed an advance payment price of $2.335 per gross ton f. o. b. mines, subject to increase or decrease, the final price to be contingent on the cost of production.
The plaintiff’s sales manager, immediately upon receipt of this order on June 15, wrote the Secretary of the Navy (Finding III) stating that immediately upon receipt of his order of the 14th instructions had issued to the mines to provide the coal referred to, but stating that the entire product of the company’s mines up to April 1, 1918, was under contract and that it would expect the Government to save it harmless if any of the existing contracts were necessarily breached by reason of this Government “ requisition.”
A copy of that letter was forwarded to the president of the company, and immediately on its receipt he wrote the Secretary of the Navy (Finding III) stating he deemed it his duty, before the matter went any further, to say that the letter of the sales manager did not wholly state the position of the company, and “ to the end that there be no misunderstanding hereafter ” that “ we look upon the price of $2.335 per gross ton as an advancement upon a final price to be determined not alone by damage suits to which the company may be subjected but by a consideration as well of market prices and loss of profits.”
The Secretary of the Navy acknowledged receipt of this letter (Finding III), thanked its writer for the manner in which he had acceded to the department’s “ request,” with other suggestions rather indefinite in character.
On June 16, 1917, in response to a request from the navy yard at Norfolk for the immediate delivery of some coal, the plaintiff, having coal at that place intended for delivery on othex' orders, made its first delivery of 1,803 tons, and its second delivery was made on June 21.
Navy Order N-13, bearing date August 9, 1917, pleaded as “ Exhibit B ” and made a part of Finding IV by reference, was transmitted to the plaintiff by the Paymaster General of the Navy with a letter referring to it as “ confirming *242 and. supplementing letters from the Secretary of the Navy, dated June 14, 1917, and July 12, 1917, which in full are a part of this order.” The letter of July 12, 1917, referred to a small quantity of coal for delivery at Savannah, Ga., as to which there was a cancellation, and hence it is not involved here. Compliance with this order was said to be obligatory, and subparagraph (b) treated of terms not necessary now to discuss. A blank was appended for the execution of an acceptance by the plaintiff, which it did not do, and when by a later letter asked to execute and return the acceptance it again did not do so.
One feature of the case, the demand for the inclusion of interest in any recovery allowed, is to be disposed of by the determination of the question as to whether there was a requisitioning of this coal. If the relations of the parties were contractual, there can be no award of interest. (See sec. 177, Judicial Code, 36 Stat. 1141, amended Nov. 23, 1921, 42 Stat. 316, and reenacted June 2, 1924, 43 Stat. 346.)
As bearing upon this question plaintiff distinguished this case from the Consolidation Coal Company, No. A-262, decided J anuary 26, 1925, and, on motion for new trial, April 20, 1925, 60 C. Cls. 608, in which just such a Navy order figured, by the fact that in that case there was an acceptance of the order whereas in this case there was no acceptance. But there are other considerations which it was not found necessary to discuss in the Consolidation case. There contractual relations were derived from the acceptance of Navy Order N-69, the same in form as herein, but because here there was no acceptance of the Navy Order, N-13, it does not necessarily follow that the relations of the parties were not contractual.
Before the issuance of Navy Order N-13 more than a third of the coal here involved had been delivered. Deliveries had commenced very soon after the receipt of the order of June 14, which all the facts show was accepted, with reservations as to the basis of compensation, and even if Navy Order N-13, unaccepted by plaintiff, was an attempted requisitioning, which is by no means conceded, it is difficult to conceive how established contractual relations could thtis be disrupted. The right of eminent do *243 main existing in the sovereign is far-reaching, designed to enable the sovereign, without the consent of the other party, to acquire that which in its sovereign capacity it needs, .but we know of no rule permitting it, where those needs are being supplied under a contract, to abrogate those relations and, of its own motion, convert the subject matter of a contract being duly performed by delivery into the subject matter of a requisition. But Navy Order N-13 was not a requisition; it was an order, acceptance of which was requested and again requested. If a requisition, acceptance was unnecessary. American Smelting Co. v. United States, 259 U.S. 75. And if intended merely as an order to be accepted by the plaintilf, it could not by nonacceptance convert it into a requisition. If there is any inference to be drawn from its nonacceptance, it seems reasonable to conclude that plaintiff preferred that its status remain as already fixed. It was regarded by plaintiff, according to the evidence, as simply “'confirming ” the letter of June 14.
[Reverting to the order of June 14, 1911, which, it is to be said, was the only order in existence with reference to this coal for nearly two months and until the issuance of Navy Order N-13 of August 9, 1917, the order itself and the authority therefor are subjects for consideration.
It is to be observed not only that this order was neither in terms a requisition nor couched in such language as to justify such a construction, but also that at this time the 'Secretary of the Navy had no power to requisition. The acts of March 4, 1917, and June 15, 1917, are pleaded. The latter of these acts had not then been passed. The former gave certain powers to the President but did not authorize their exercise through some other agency as did the latter. Under neither act was there any delegation of power to the Secretary of the Navy until the Executive order of .August 21, 1917. It is true that this Executive order referred to the powers of the President under the act of .March 4, 1917, as well as that of June 15, 1917, -and assuming that the President might delegate his powers under the act of March 4, without express authority therefor, it .is plain that no power could be exercised thereunder by *244 the Secretary of the Navy without such delegation. There-were features of that act which at the time of its passage-necessarily required the personal action of the President, before it could be operative for any purpose. The declaration of war probably obviated the necessity for a proclamation of national emergency by the President, but it could' hardly serve to broaden the act in any other respect. But this act contemplated a procedure in the matter of compensation and partial payment which finds no place in the; letter of June 14, and there is no reference therein to-this act.
Earlier than these acts is the national defense act of June-3, 1916, which in section 120 empowered the- President through the head of any department to place orders which should be obligatory. A large part of this section deals, with procedure by the Secretary of War and Army supplies, but its general terms are broad enough to include the-placing of an order for coal for the Navy. The difficulty in locating the authority for this order, whether under the-national defense act or not, arises because, while in some-of its phraseology it savors of an obligatory character, it. is an order by the Secretary of the Navy with no suggestion that he is acting for the President. In many instances the-President does act through the heads of departments and they, when acting, are regarded as acting for him, but when, the authority for the action emanates from the President it is customary to indicate that the action is by direction of or-by the authority of the President.
But whether this order was under the authority of the national defense act or not seems not necessary of determination, for, in any event, it was an accepted order fully performed, and if we must conclude that it was merely an order-for coal for the use of the Navy, placed by the Secretary, it was an authorized order, the acceptance and performance of which determined the relations of the parties to be contractual. The fact that the final price to be paid.for the-coal was in abeyance did not defeat the contract or convert the order into something else. See Federal Sugar Refining Company, No. B-147, decided January 19, 1925, 60 C. Cls.. 184.
*245 There remains for determination the question of the price which the plaintiff is entitled to receive for its coal furnished under contract, and in that connection necessarily the question of whether it is entitled to receive more.than it- has ¡already been paid. Subsequent to the placing of this order, which had provided for an advance payment of $2,335 per gross ton, subject to adjustment, the President had fixed the tentative price of coal at the mine at $2.24 per gross ton, which for a time was continued under the Fuel Administration, and when the plaintiff rendered its bills at '$2,335 per gross ton some of them were restated by the Navy Department at $2.24 and the remainder of them were returned to the plaintiff to be restated at that figure and the plaintiff was paid $2.24 per gross ton and also the freight which it had paid for the transportation of the coal from the- mines to Norfolk. The terms of the order of June 14 as to advance payment were thus not complied with by the •Government.
This order stated that the price of the coal to be determined later would be contingent upon the cost of production with a reasonable profit added, and it is open to the •assumption that the Navy Department then expected the price of coal at the mine to be equal to or greater than '$2,335 per gross ton, else it would not have fixed that amount •as advance payment. The Government is not in the habit •of paying more under such circumstances than it expects ultimately to pay. This order was accepted by the sales manager of the plaintiff company to the extent at least of indicating that it would furnish the coal as requested, although there was a condition imposed upon the entering of the order predicated upon the fact that the plaintiff already had its output for a considerable time under contract, and the sales manager evidently conceived the possibility that the supplying of the Navy order would necessitate the breaching of some other contract. It does not appear that the sales manager had final authority to bind the plaintiff as to terms, but even if he had it appears that when the attention of the president of the company, who must be admitted the superior authority, was called to the matter and within five days after the receipt of the order and *246 wiiihin such a short length of time that it was hardly to be assumed that coal would have already been delivered upon the order, he wrote the Secretary of the Navy indicating the desire of the company to comply with the order of the Secretary, but specifically reserving the question of price to be paid. The first delivery had been made on the 16th of June, the day after the receipt of the order, and four days beforethe writing of the letter by the president,, but this was a quite unusual occurrence, being the result of a hurried call from the navy yard at Norfolk which the plaintiff was able to comply with because it happened to have coal on the cars at that point which had been received for application on other orders, but which it was willing to divert in order to supply the apparently urgent needs of the.Navy, and it would, it seems to us, be an entirely too narrow construction to hold that this delivery antedating the president’s letter foreclosed the transaction on the basis of the Secretary’s order and the letter of the sales manager. If such were to be the construction, that condition at least would be applicable only to this first delivery, for the president’s letter indicating that he as the representative of the company and its stockholders was imposing the conditions indicated in his letter “before the matter goes further.” But upon the whole transaction we are of the opinion that the parties are to be deemed to have entered into a contract for the furnishing of this coal with the price in abeyance under such circumstances as entitled the plaintiff to be paid the fair market value therefor.
In the consideration of this matter the parties seem to have eliminated from their calculations the freights which the plaintiff paid for the transportation of the coal from the mines to the place of delivery, and which were repaid to the plaintiff, and to have considered the case purely from the standpoint of the value of the coal, exclusive of freight, which results in a f. o. b. mines price. Of course, the value of the coal at the place of delivery necessarily included the transportation expenses in getting it there; but to harmonize ourselves with the theory of the record we have found the value of the coal upon the basis stated, therefore offsetting as against that value the amount which the Gov- *247 eminent paid, the plaintiff for the coal at $2.24 per gross ton, eliminating also from that side of the account the freights paid. This under the findings entitles the plaintiff to a judgment for $164,589.95, and we have so ordered.
Graham, Judge; Hay, Judge; Booth, Judge; and Campbell, Chief Justice, concur.