Campbell, Chief Justice,
delivered the opinion of the court :
This is a suit by the New River Collieries Company claiming a large sum for coal alleged to have been taken by the Government at or' near Hampton Roads, besides a smaller quantity taken at the mines. Payments were made from time to time upon invoices rendered when the coal was delivered, and in the amounts' shown by the invoices, but the claim is that these did not afford the just compensation to which the plaintiff was entitled.
*227 The transactions out of which the suit grows had their origin in a letter by the Secretary of the Navy to the Chesapeake & Ohio Coal and Coke Company,' dated June 14, 1917, followed by three orders signed by the Paymaster General of the Navy and known as Navy Order N-76, Supplementary Navy Order N-76, and Navy Order N-3005. The first of these orders, dated August 9, 1917, called for 14,000 tons of coal at a stated price “ f. o. b. mines ”; the second dated September 22, 1917, called for 50,000 tons f. o. b. mines and 31,000 tons at Newport News; and the third order, dated June 15, 1918, was for 200,000 tons of coal to be delivered at Hampton Roads by June 30, 1919. Each of .them stated a price and also that it was issued pursuant to the provisions of the acts of March 4, 1917, 39 Stat. 1193, and June 15, 1917, 40 Stat. 182, and that compliance was obligatory. These orders were directed to the Chesapeake & Ohio Coal and Coke Company and all correspondence and other communications were had with that company. Invoices, at ,the stated prices or at prices prescribed from time to time by the Fuel Administrator, were rendered in its name and payments thereof were made to the same company. No order was issued to nor was any communication had with the New River Collieries Company. One of the questions in the case is whether, in these circumstances, the New River Collieries Company can maintain this suit.
The alleged dates of taking are between July 1, 1917, and June 30, 1919. The original petition was filed August 4, 1922. A fourth amended petition was filed December 21, 1926. In accordance with a rule of court in that regard, the petition mentions the statutes on which the cause of action is based, averring that the claim is founded upon the Fifth Amendment; upon the act of March 4, 1917, 39 Stat. 1193; upon the act of June 15, 1917, 40 Stat. 182; and that jurisdiction is conferred on this court by these acts to award a balance of just compensation. Where private property is taken for' public use there can be no doubt that just compensation is due. “ The owner was entitled to the full money equivalent of the property taken, and thereby to be put in as good condition pecuniarily as it would have occupied if its property had not been taken,” per Mr. Justice Butler in United *228 States v. New River Collieries Co., 262 U. S. 341, 343, citing Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299. See also Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123; Liggett & Myers v. United States, 274 U. S. 215. It is also laid down in the case first cited (262 U. S.) that where private property is taken for public u,se and there is a market price prevailing at the .time and place of the taking that price is just compensation. The rules thus stated must be regarded as settled. But it is equally well settled that the taking must be authorized by Congress and that the officer assuming to act for the Government should have authority in that regard. Hooe case, 218 U. S. 322, 336; North American Co., 253 U S. 330, 333. Where the statutes relied upon prescribe the procedure there must be at least a substantial compliance with them. The process whereby the Government is held to have expropriated the citizen’s property is designed to be an orderly one.
1. As to the power to take, it is said in the Hooe case, supra (p. 336), that the taking of private property by an officer of the United States for public use without being authorized, expressly or by necessary implication to do so, by some act of Congress, is not the act of the Government. And in the North American, Co. case, supra (p. 333), it is said that although Congress may have conferred upon the executive department power to take property for a given purpose, the Govérnment will not be deemed to have so appropriated private property “merely because some officer' thereafter takes possession of it with a view to effectuating the general purpose of Congress.” It was held in this case that authority conferred by the act on the Secretary of War could not be exercised by the commanding general of the department of Alaska, where the property was located, unless he was authorized by the Secretary of War.
The authority for placing the orders in the instant case is averred to be and must primarily be found in the acts of March 4, 1917, and June 15, 1917. The allegation that the claim is founded on the Fifth Amendment can only relate to the just compensation it requires because there was no authority acted upon or suggested as being in the President or anyone else to requisition coal, so far as concerns this suit, *229 except the two acts mentioned, or the admittedly extensive powers granted by the Lever Act of August 10, 1917. Except as granted by these acts there was a lack of authority to take. Hooe case, supra; North American Co. case, supra. The act of March 4, which expired by limitation on March 1, 1918, authorized the President to place an order with any person “ for such ships and war material ” as required “ and which are of the nature, kind, and quantity usually produced or capable of being produced by such person.” The act of June 15 extended this grant of authority because, while using in general the terms of the earlier act it authorized the President to place an order for ships “ or material,” adding also a definition of material that gives a broader meaning than “ war material ” could have. Compliance with such orders was declared to be obligatory. Armed with this authority the President could place obligatory orders with designated classes of persons. He was authorized to exercise these granted powers through such agency as he should determine and by Executive' order set forth in the findings, and under date of August 21, 1917, the President directed that the Secretary of the Navy should have and exercise all power and authority vested in the President in the two acts “ in so far as applicable to and in furtherance of the construction of vessels for the use of the Navy and of contracts for the construction of such vessels and the completion thereof, and all power and authority applicable to and in furtherance of the production, purchasing, and requisitioning of materials for construction of vessels for the Navy and of war materials, equipment, and munitions required for the use of the Navy and the more economical and expeditious delivery thereof.” The authority so delegated could be exercised by the Secretary directly or through officers “ who, acting under his direction, have authority to make contracts on behalf of the Government.”
It is quite plain that the President did not delegate or intend to delegaté to the Secretary of the Navy or officers of the Navy all of the power and authority vested in him by these acts. The use in the order itself of the phrase “ in so far as applicable to and in furtherance of ” certain things suggests a limitation, and, as will appear, there was a reason *230 for it. The only words in the order that can embrace fuel or coal are “ war material,” and it is noticeable that the reference to war materials adopts the restricted phrase in the act of March 4 instead of the broadly defined “ material ” used in the act of June 15. If this order stood alone and there were no other legislation than the two acts, the construction of the order might be more liberal than the mere words admit of, because of the conditions giving rise to the power granted by the statutes. But after the act of June 15 another act w’as passed, that of August 10, 1917, known as the Lever Act, which very much increased the powers of the President under former acts. By section 10 he is authorized to requisition, among other things, “ fuels and supplies ” necessary for the Army and the maintenance of the Navy, and by other sections he may fix prices and take control of coal mines. On the very day, August 21, on which the Executive order delegated powers to the Secretary of the Navy, another Executive order was issued prescribing, provisionally, the prices of coal, and on August 23 yet another Executive order appointed the Fuel Administrator and conferred on him the powers given to the President by the Lever Act so far as the same applied to fuel, and also directed all departments of the Government to cooperate with the Fuel Administration. Two of the three orders in this case were issued from the Bureau of Supplies and Accounts after August 21, both of them making express reference to the Fuel Administration. It would seem reasonable, therefore, to hold that when the Executive order of August 21 was actually issued consideration had been given already to the order of August 23 that would delegate powers to the Fuel Administrator and that the one order was not intended to overlap or interfere with the powers of requisition conferred by the other under the Lever Act. The two earlier acts authorizing the placing of obligatory orders provided for their enforcement where necessary by taking charge of the factory or plant. The Lever Act authorizes taking over of plants and has especial reference to coal mines. Is it to be supposed that the Executive orders conferred on the Navy Department the power to take over a coal mine and thereby interfere with the broader powers conferred by the act of August 10 that were delegated *231 to the Fuel Administrator? This view harmonizes with the New River Collieries Co. case, supra, because the claim there was that coal was requisitioned at Hampton Eoads for use of the Navy between the dates of September 17, 1919, and February 1, 1921, the opinion stating that the taking was under sec. 10 of the Lever Act. In the opinion of the Circuit Court of Appeals (276 Fed. 690) it is said that the Government “through the Navy Department requisitioned a large tonnage of coal belonging to the Collieries Company * * * and tendered payment at a price named by the Navy Department.” The orders themselves do not appear otherwise than as stated. But referring to this case, the petition in the instant case avers that the facts “ as to the method of commandeering were the same as in the case at bar,” the commandeering orders having been directed to the Chesapeake & Ohio Coal and Coke Company, and the plaintiff’s brief characterizes it as a suit “ between the same parties and under like facts.” Assuming the facts to be as thus stated, the case mentioned adds force to what we have said, because the opinion of the Supreme Court declares it to be a case under section 10 of the Lever Act, and it could not have escaped attention that of suits based on. this section the district courts have exclusive jurisdiction. Pfitsch case, 256 U. S. 547. Manifestly, the same facts could not give rise to a requisition under a different statute without defeating the intention to confer exclusive jurisdiction under the section mentioned. If, on the other hand, the orders in the New River Collieries Company case purported to be under the Lever Act and similar to those found in the White Oak Coal Co. case, 15 Fed. (2d) 474, the change in the form of the order from the acts of March 4 and June 15 is significant as indicating a lack of authority under the latter to accomplish the desired requisition. This act of June 15, 1917, was substantially reenacted in 1918, 40 Stat. 720, and was in force during all the time in question, as was also the Executive order of August 21 delegating power to the Navy Department. If the coal could be requisitioned under this act, why turn to the other statüte ?
Tn two cases presenting claims for coal and based upon orders under the acts of March 4 and June 15 this court held *232 that a contract arose whereby the Government was bound to pay the market price of the coal delivered. Consolidation Coal Co. case, 60 C. Cls. 608; Pocahontas Fuel Co. case, 61 C. Cls. 231. Both of these cases were for large quantities of coal furnished the Navy during parts of the period here involved. In a later case, Liggett & Myers, 61 C. Cls. 693, that did not involve the authority to requisition fuel, this court held there was a contract. The case was tried upon a stipulation of facts that contained no reference to the powers delegated by the President under the acts of March 4 and June 15. No question was raised upon the authority of the Secretary, the case turning in this court upon the right to interest on an admitted balance. The Supreme Court reversed the judgment and held that the property had been taken by eminent domain, referring, among others, to the general defense act of 1916, which can have no possible application in the instant case, because the fact averred and found to be is that the authority in the Navy Department to place the requisition orders rests upon these acts and the Executive order of August 21. The decision in Liggett & Myers does not qualify the New River Collieries Company case or affect the ruling that that suit was properly brought under section 10 of the Lever Act.
2. But in addition to this question of authority is that of a want of substantial compliance with the procedure directed by these statutes. They provide for just compensation, to be determined by the President, and if the amount so determined be unsatisfactory the person entitled may accept seventy-five per cent thereof and sue for the additional sum that will make just compensation. The averments of the petition and the facts are to the effect that no such action has ever been taken. The orders mentioned a price that would be paid and further that if unsatisfactory the right under these statutes to- take 15 per cent was open. The Chesapeake & Ohio Coal and Coke Company, to whom alone the orders were directed, repeatedly stated its purpose to reserve all rights under the statutes named in the orders. It rendered its invoices at the prices stated, or at such prices as were prescribed from time to time by the Fuel Administration. The allegation, accordingly, is that the payments of these
*233 invoices were for the entire tonnage at the full prices mentioned, and this allegation is sustained by the proof. The Government paid the freight besides some other charges, which included war tax. These acts provide a method and procedure whereby the Government may be made to respond. It has been held that if the Government attaches • purely formal conditions to its consent to be sued these conditions must be complied with and the words being in the statutes “ they mark the conditions of the claimant’s right.” Rock Island Railroad Co. case, 254 U. S. 141, 143. In the Seaboard Air Line Railway Co. case, supra, and the case of New River Collieries Company, supra, it appeared that action had been taken. In the Brooks-Scanlon Corporation case, 265 U. S. 106, and a number of similar cases, and in Liggett & Myers case, supra, there was an ascertainment of compensation which the parties would not accept. The acceptance of 100 per cent of the prices fixed in the order does not deprive the court of jurisdiction of the case. Houston Coal Co. case, 262 U. S. 361. But such acceptance does concern the merits. United States v. McNeil & Sons, 267 U. S. 302; White Oak Coal Co. v. United States, 15 Fed. (2d) 474. The latter was a suit brought in the district court on account of a requisition order by the Navy Department for coal to be delivered under the Lever Act. The order contained the provision that if the price was not satisfactory 75 per cent of it could be accepted and suit brought for the additional sum that would afford just compensation. The plaintiff accepted the prices fixed by the order and afterwards brought suit. The court says.(p. 477) : “Under the law, as well as under the offer of the Government, plaintiff was entitled to the full amount of the price fixed, only in the event it was accepted in full satisfaction. It had the right to decline the Government’s offer and sue for the value of the property taken, if it desired to do so, but in that event it was entitled, not to the full amount of the price fixed, but only 75 per cent thereof. It obtained the full price by accepting the offer, certifying the price fixed as satisfactory, and rendering invoices, not for 75 per cent, but for the full price, which it accepted without protest.” In the instant case there was no acceptance of the Navy orders as satisfactory in the first instance, but the *234 full price was ultimately paid upon invoices rendered and payments made without protest. As was further said in the case just cited: “ It voluntarily elected to pursue one of two inconsistent remedies as a means of obtaining compensation for its property. Havjng obtained benefits thereby which it could not otherwise have obtained, it is estopped from pursuing the other remedy.” Certiorari was denied in this case. (273 U. S. 756.) The instant case was begun by petition filed in August, 1922. This was subsequent to the decision of the Circuit Court of Appeals in New River Collieries Co. case, 276 Fed. 690, though the requisition of coal there involved was long after the alleged requisition in the instant case. The Chesapeake & Ohio Coal and Coke Co. had been paid the domestic market prices, and notwithstanding its early declaration that it would assert its rights under the two acts mentioned in the orders, it took all of its invoice prices and did not confine itself to the right afforded by these acts. Nearly five years after the first shipment and three years after the last the suit is brought by the New River Collieries Company to recover the export value of the coal. Relying upon the statutes there ‘should be compliance with them. The objections made after the first order was issued sufficiently apprised the department of the unwillingness of the Chesapeake & Ohio Coal and Coke Company to accept the prices. But it could change its view on this subject, and we think it should be held to have done so, when it received full payment. Though these statutes were subsequently repealed, the powers granted by them to the President to determine compensation were conferred upon the United States Shipping Board Emergency Fleet Corporation by the act of June 5, 1920, 41 Stat. 989, thus indicating that Congress regarded such action as a prerequisite to recovery in court. And whatever may be said about the effect of the Executive order of August 21, 1917, it clearly did not delegate this duty of determining just compensation. The orders issuing from the Navy Department stated prices that varied from time to time in accordance with rulings of the Fuel Administration, but the Navy Department could not fix prices, and for the action of the Fuel-Administration there is no remedy except in the District Court. Pfitsch case, supra. The prices the *235 latter prescribed were applicable generally to producers, distributors, and vendors of coal, and notwithstanding greater prices could possibly have been realized in open markets, no liability of the Government to the owners or vendors arose from the regulation of prices. Pine Hill Coal Co. case, 259 U. S. 191, 55 C. Cls. 433; Morrisdale Coal Co. case, 259 U. S. 188, 55 C. Cls. 310. For the reasons that the full prices have been accepted and that the statutory procedure is not observed, we think the plaintiff’s suit should fail.
3. Another question urged by the defendant is that the New Kiver Collieries Company can not maintain this suit. The acts provide for the placing of “ an order with any person” for material of the nature, kind, and quantity usually produced or capable of being produced “by such person.” A refusal to comply with the order arms the President or his agent with power to enforce it by taking possession of “ any ship, charter, material, or plant of such person” and use the same, the act of March 4 employing the term “ factory ” where “ plant ” is used in the later act. There can be no doubt that the right of eminent domain may be exercised, when authorized, outside of these statutes, but when they are invoked and relied upon they designate the persons to be affected. As already stated, the orders were placed with the Chesapeake & Ohio Coal and Coke Company, a West Yirginia corporation. Indeed, the first communication was sent to that company on June 14 — prior to the enactment of the statute of June 15 and prior to any delegation by the President of authority — and it was not until afterwards assured that the order was obligatory under the two acts that it proceeded to comply Avith its terms. That company owned no coal mines and had no coal except such as it might acquire from others. It bought and sold coal and was the sales agent of the plaintiff and also of other coal-mining corporations. The facts show that all of the coal involved in this action was delivered by the Chesapeake & Ohio Coal and Coke Company. All of the correspondence relative to the coal or the orders was had between this company and the Navy Department. It arranged with the carrier for shipments and “ it was understood by the Government and the Chesapeake & Ohio Coal and Coke Com *236 pany tbat the company was to pay the freight and other charges for. handling the coal * * * and the Government was to reimburse said company therefor.” The prices stated in the orders, which were increased from time to time in accordance with those fixed by the Fuel Administration under the Lever Act, were paid to this company for the coal delivered. The plaintiff in this action is the New River Collieries Company, a New Jersey corporation, which owned and operated coal mines. It sold its coal through the Chesapeake & Ohio Coal and Coke Company, the stock of which company it owned. The officers of the two companies were substantially the same. The coal came from the mines of the plaintiff company. Its mines, among others, appeared on the “ Navy Acceptable List ” kept by the Navy Department. The coal destined for western points was shipped on Government bills of lading but that delivered at tidewater was shipped under arrangements made between the railroads and the Chesapeake & Ohio Coal and Coke Company, whereby the latter was billed from time to time for the coal delivered. There was nothing in the orders requiring that the coal be sent from the plaintiff’s mines, and there were other mines from which it could have been shipped. The statutes authorize the placing of orders with the owner, but if not so placed they are not obligatory. If the Chesapeake & Ohio Coal and Coke Company had refused or failed to comply with the orders there was no coal or mine to be taken possession of, because it had neither. The orders placed with it were not roving commissions to be placed as it saw fit. The plaintiff company was not obliged to furnish any coal and its mines could not have been seized. It had none of the burdens and was not subject to any of the penalties prescribed by the acts. It is the right to enforce compliance that gives the orders their obligatory effect. The Chesapeake & Ohio Coal and Coke Company’s invoices as rendered from time to time were headed Navy Department, “ Bought of the Chesapeake & Ohio Coal and Coke Company (selling agents New River Collieries Company),” and this is the only reference to the latter in any communication. The terms under which the coal was delivered to this sales agent do not appear. The phrase *237 itself is indefinite. We had occasion to consider the activities of selling agents in J. H. Lane & Co., 62 C. Cls. 721, 722, 731, where the selling agent guaranteed the payments. It is entirely consistent with what was done to say that the term sales agent is descriptive of the person. The New Biyer Collieries Company furnished the coal, loading it on the cars, for the Chesapeake & Ohio Coal and Coke Company. It was not ordered by the Government to do this. Its action was voluntary. The prices prescribed were as much as it could have received from any purchaser at the mines. The principal objections interposed by the Chesapeake Company were made in 1917. In June of that year that company notified the Navy Department that it had “not agreed to supply coal at less than a very fair price of $2.95,” and the prices in Navy order N-3005 were above this amount. But the New Biver Collieries Company made no objection at any time until this suit was brought in 1922. Until this event no communication passed between it and the Government. If in these circumstances it can recover as for a requisition of its coal, the language of the two acts relied upon becomes meaningless. It has had no orders placed with it, and was not required by the Government to furnish coal. It has not called upon any governmental agency to determine compensation. It has received the full price offered and has never uttered a protest or objection until, as stated, this suit was brought. Having taken this position and obtained benefits thereby, it can not have recourse to a statute with which it has never complied. White Oak Coal Co., supra. Parties when subjected to requisition or obligatory orders, can avail themselves of the benefits of the statute in the increase of the prices and allowance of interest on deferred payments, and so also may the Government avail itself of the fact that its orders were not directed to and were not obligatory upon such parties.
In an amended petition filed in 1924 the Chesapeake & Ohio Coal and Coke Company is added as a party suing for the use of the New Biver Collieries Company. This' is done, plaintiff insists, out of abundance of caution and not because it is necessary. If it is a necessary party, a large part of *238 the claim would be barred by the statute of limitations. The amendment does not aid the plaintiff.
In plaintiff’s brief appear references to a stipulation entered into in 1924 between plaintiff’s attorney and the then Assistant Attorney General assigned to this court. His successor refused to be bound by this stipulation, giving timely notice to the other side. Evidence was afterwards adduced on the disputed questions. This court more than forty years ago declared that while the Attorney General had authority by statute to conduct suits in this court, and could do every act which an attorney at law might lawfully do in a suit between individuals, he can not bind the Government by admitting facts adverse £o it and not officially known to him to be true. See Campbells case, 19 C. Cls. 426, 429. This rule has been somewhat relaxed, and cases are frequently tried upon stipulation duly signed, but the right to reject a stipulation has not been surrendered. This is not to say that the Attorney General may not consent' to a judgment upon agreed facts. It is to say, however, that all below him may not be accorded the like authority. It may be seriously questioned whether the Assistant Attorney General had knowledge of the facts, but, at any rate, whether the facts or conclusions be in issue, the stipulation was made, “ subject to the approval of this honorable court.” And the court does not approve it. As already said, the plaintiff has had full opportunity to make all proof it desired.
Upon the whole case our conclusion is that the petition should be dismissed. And it is so ordered.
Moss, Judge; Graham, Judge; and Booth, Judge, concur.